CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
August 07, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ANGELA S.,[1] | ) | |
| | ) | Civil Action No. 7:23-CV-00228 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | |
| Commissioner of Social Security, | ) | By: C. Kailani Memmer |
| | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Angela S. ("Angela") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). I now submit the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

For the reasons detailed below, I recommend the presiding District Judge **DENY** Angela's Motion for Summary Judgment, ECF No. 12, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Angela failed to demonstrate that she was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work; instead, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

On December 31, 2020, Angela filed an application for DIB, alleging disability starting on October 30, 2015. R. 189–91. On March 31, 2021, she filed an application for SSI, also alleging disability starting on October 15, 2015. R. 194–99. The Commissioner denied Angela's claim initially and on reconsideration. R. 110, 129. On January 21, 2022, Angela requested a hearing before an Administrative Law Judge ("ALJ"). R. 141. On July 7, 2022, Angela appeared before ALJ David Lewandowski by telephone. R. 37–64. Angela amended her alleged onset date to July 25, 2018. R. 41. Robert Lester testified at the hearing as an impartial vocational expert. R. 61–63. On August 25, 2022, the ALJ entered a decision analyzing Angela's claims under the familiar five-step process[4] and denying her request for benefits. R. 15–32.

At the first step, the ALJ found that Angela had not engaged in substantial gainful activity since July 25, 2018, the alleged onset date. R. 21. At the second step, the ALJ found that Angela has the following severe impairments: supraventricular tachycardia ("SVT"), obesity, and edema of the ankles and feet. *Id.*

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520)); *Heckler v. Campbell,* 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

At the third step, the ALJ found that Angela's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 23–24. The ALJ specifically considered Listings 4.05 (recurrent arrhythmias) and 4.11 (chronic venous insufficiency). *Id.* The ALJ noted that while obesity is no longer a listed impairment, it should be considered in conjunction with Angela's impairments; however, the ALJ found the medical evidence "does not support a finding that the claimant's obesity has reached a level that would cause the other impairments to meet or medically equal a listed impairment." R. 24.

The ALJ concluded Angela retained the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] can frequently balance. She can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl but cannot climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to temperature extremes and humidity. She should avoid exposure to industrial hazards. She is expected to be off task 10% of the workday and absent 1.5 days per month.

*Id.*

At the fourth step, the ALJ found that Angela has no past relevant work. R. 30. At step five, the ALJ determined that Angela could perform jobs that exist in significant numbers in the national economy, such as clerical assistant, router, or classifier. R. 31. Thus, the ALJ concluded a finding of "not disabled" was appropriate. R. 32. Angela appealed the ALJ's decision, and on February 27, 2023, the Appeals Council denied her request for review. R. 1–3. This appeal followed.

### FACTS

**A. Angela's Background and Testimony**

Angela was born on January 31, 1971. R. 189. She has a high school education. R. 42.

At the July 7, 2022 hearing, Angela testified she was currently working at Craig County Emergency Management, where she had been working since October 25, 2020. R. 42. The job was

4

sedentary, and she worked two hours per day, nine days per month. R. 42–43. She testified that

after July 2018, she worked for IGA Express as a cashier. R. 45–46. She worked approximately

three days per week in five- or eight-hour shifts. R. 46. She also worked at Carper Quick Mart as

a cashier for three or four days per week in six- or eight-hour shifts. *Id.*

Regarding her SVT episodes, Angela testified she often goes long periods without anything

happening, but she will sometimes have a random episode once a month. R. 48. The last episode

she had was in May 2022. R. 49. Before that, she had SVT episodes in March 2022 and December

2021. *Id.* After an SVT episode, Angela often has no energy for two or three days. R. 50–51. She

testified SVT episodes will typically resolve after about three to five minutes. R. 58.

Angela testified that, aside from her SVT, she feels tired often. R. 52. She testified she has

swelling in her ankles and feet. R. 53. Three or four times per day, she elevates her legs for about

15 minutes to reduce the swelling. R. 53–54. She testified that she could sit for 15–20 minutes at

a time before she has to change positions. R. 55. She testified that she could stand in one spot for

30–45 minutes. *Id.*

Angela testified that if she can get six or seven hours of sleep in a night, then she feels

great; however, she normally gets only four or five hours of sleep. R. 55–56. She testified that she

has difficulty falling asleep and staying asleep because of restless leg syndrome with her right leg.

R. 56.

Angela testified she lives in a house with her fiancé and his parents. *Id.* She does chores

around the house, such as cooking, washing dishes, washing laundry, and taking her dog outside,

and she testified she typically does not have any difficulty with those chores. R. 56–57. Angela

has a driver's license, and she has no difficulty driving. R. 57.

### B. Medical History

On March 24, 2015, emergency medical service personnel transported Angela to the emergency department at Roanoke Memorial Hospital after complaints of abdominal pain, nausea, and vomiting. R. 383–91. Angela's heart rate was 200 when emergency responders arrived, so they administered 6 mg of adenosine. R. 384. Angela denied feeling like her heart was racing and could not recall when the rapid heart rate began. *Id.* Physical examination findings were unremarkable. R. 384–85. Chest x-rays revealed diffuse interstitial prominence with mild left lower lobe airspace opacity, as well as tiny bilateral pleural effusions posteriorly. R. 385. The assessment was tachycardia over 200, suspected AVNRT. R. 390. Medical providers advised Angela to return to the emergency department if her symptoms returned. *Id.*

On March 25, 2015, Angela underwent an echocardiogram ("ECG"). R. 537–41. The ECG revealed overall left ventricular ejection fraction estimated at 55–60%, mild concentric left ventricular hypertrophy, and normal left ventricular diastolic filling. R. 540.

On April 27, 2015, Angela presented to the care of Matthew Schumaecker, M.D., at Carillion Clinic, Cardiology Department, in Roanoke, Virginia. R. 380–83. Angela reported she had been feeling well, with no complaints of chest pain, shortness of breath, lightheadedness, dizziness, or palpitations. R. 381. Dr. Schumaecker diagnosed Angela with AV nodal re-entry tachycardia and elevated troponin. R. 382–83.

On May 26, 2015, Angela called emergency responders with complaints of anxiety and chest tightness, and they transported her to the emergency department at Roanoke Memorial Hospital. R. 360–69. Emergency responders noted Angela's heart rate was 190 when they arrived. R. 361. Physical examination findings were unremarkable aside from tachycardia. *Id.* Providers administered 6 mg adenosine to Angela. R. 362. The record indicates Angela would be a good

candidate for catheter ablation; however, she stated she was not interested in ablation at that time. R. 364.

On July 31, 2015, Angela presented to the care of Carl Musser Jr., M.D. R. 357–59. Angela reported she was feeling much better than she felt in May. R. 358. Dr. Musser notes Angela had been free of any arrhythmias since that time. *Id.* ECG results revealed normal sinus rhythm with a ventricular rate of 65 beats per minute. R. 359. Dr. Musser noted Angela had been free of symptomatic SVT since starting thyroid replacement, and so he indicated he can take a conservative approach to her SVT. *Id.*

On January 9, 2017, emergency responders transported Angela to the emergency department at Roanoke Memorial Hospital. R. 350–56. Emergency responders noted Angela's heartrate was between 210–220 beats per minute. R. 351. Angela reported palpations and feelings of anxiety but denied chest pain or shortness of breath. R. 352. Angela received 6 mg adenosine. R. 354. She was discharged but told to return to the emergency department immediately if her symptoms changed or worsened. R. 355.

On January 18, 2017, Angela returned to the care of Dr. Musser. R. 347–50. Angela reported her recent SVT episode as the first episode of SVT since she last saw Dr. Musser in July 2015. R. 348. Physical examination findings were unremarkable. R. 349–50. Dr. Musser suggested Angela consider ablation as a potential cure for SVT; however, Angela was reluctant to move forward given the nature of the procedure. R. 350.

On May 11, 2017, Angela went to the emergency department at Roanoke Memorial Hospital. R. 341–45. Medical responders administered 6 mg adenosine, and Angela was asymptomatic at the emergency department. R. 341.

On May 16, 2017, Angela was scheduled to undergo surgery for catheter ablation for SVT; however, the procedure was cancelled after she became overwhelmed. R. 338–40.

On November 5, 2017, Angela presented to the Craig County Rescue Squad station. R. 332–37. She reported not feeling well, and her heart rate measured 210 beats per minute. R. 332. Emergency personnel administered 6 mg adenosine. *Id.*

On March 22, 2018, Angela presented to the care of Adrienne Kinsey, D.O., at Salem Family Practice. R. 330–32. Dr. Kinsey noted Angela was "hoping to get disability for her heart issue and anxiety." R. 330. Physical examination findings were unremarkable. R. 331. Dr. Kinsey made no findings. R. 330–32.

On April 3, 2018, Angela presented to the care of John Travis Hansbarger, M.D., at Craig County Health Center. R. 684–89. Physical examination revealed diffuse enlargement of the thyroid. R. 686. Dr. Hansbarger assessed Angela with uncontrolled type-2 diabetes mellitus, unspecified hypothyroidism, unspecified hyperlipidemia, and obesity. R. 687. He continued Angela on diltiazem, levothyroxine, and Metformin. R. 689.

On April 5, 2018, Angela presented to the care of Denise Jones, FNP-C, at Roanoke Cardiology for a follow-up appointment. R. 327–29. Angela reported intermittent episodes of tachycardia and palpitations. R. 327. Physical examination findings were unremarkable aside from trace ankle edema. R. 328. However, ECG showed T wave abnormalities. *Id.* Ms. Jones diagnosed Angela with supraventricular tachycardia, unspecified-type hypothyroidism, and venous insufficiency of both lower extremities. R. 329.

On September 6, 2018, Angela presented to the care of Tina Howard, FNP-BC, at Craig County Health Center. R. 679–83. Angela complained of right knee pain that had persisted for two days. R. 679. Physical examination revealed tenderness to palpation over the medial aspect of the

right knee, as well as right knee pain at the limits of movement. R. 681–82. X-ray imaging of the right knee revealed no evidence of an acute process. R. 682. Ms. Howard assessed Angela with a right knee sprain. *Id.*

On November 1, 2018, Angela returned to the care of Dr. Hansbarger. R. 673–77. Angela reported poor sleeping over the previous week. R. 673. Physical examination findings were unremarkable. R. 675–76. Dr. Hansbarger assessed Angela with unspecified hypothyroidism and type-2 diabetes mellitus, and he continued Angela on Levothyroxine and Metformin. R. 676–77.

On December 19, 2018, Angela returned to the care of Dr. Hansbarger for a follow-up appointment related to Angela's diabetes. R. 668–72. Physical examination findings were unremarkable. 670–71.

On March 21, 2019, Angela returned to the care of Dr. Hansbarger for a follow-up appointment. R. 662–69. Physical examination results were unremarkable. R. 664–66.

On May 10, 2019, Angela returned to the care of Ms. Howard. R. 656–61. Angela complained of right hip pain that traveled into her leg for the past two weeks, which she rated at a 7/10. R. 656. Physical examination revealed abnormalities, including a non-arthralgic gait, moderate tenderness to palpation over right paraspinal, abnormalities in the lumbosacral spine, and spasms of the paraspinal muscles in the lumbosacral spine. R. 658–60. Ms. Howard assessed Angela with lower backache and prescribed 4 mg Medrol and 500 mg Naproxen. R. 660.

On May 22, 2019, Angela returned to the care of Dr. Musser. R. 324–26. Dr. Musser noted Angela "appears to be doing well from a cardiac standpoint." R. 326. He noted her lower extremity edema was likely a combination of venous incompetence, vasodilation due to warm weather, and the effects of gravity. *Id.*

On June 5, 2019, Angela returned to the care of Ms. Howard. R. 649–54. Physical examination findings were unremarkable aside from diffuse enlargement of the thyroid. R. 651–53. Ms. Howard assessed Angela with hypothyroidism, type 2 diabetes mellitus with manifestations, and onychomycosis. R. 653.

On September 24, 2019, emergency responders transported Angela to the emergency department at Roanoke Memorial Hospital following an SVT episode. R. 318–23. EMS administered 6 mg adenosine. R. 318. Angela reported an agitated feeling in her chest. *Id.* Physical examination findings were unremarkable. R. 320–21. The record shows a final impression of supraventricular tachycardia, and Angela was discharged with instructions to follow up with Dr. Musser. R. 323.

On February 9, 2020, emergency responders transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 311–17. On EMS arrival, Angela's heart rate reached a peak of 250 beats per minute. R. 311. Angela reported running out of her Cardizem prescription a week-and-a-half prior. *Id.* Physical examination revealed tachycardia. R. 312–13. Providers administered 6 mg adenosine and prescribed Cardizem. R. 314.

On February 11, 2020, emergency responders transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 303–10. Angela's heart rate was between 200 and 205 beats per minute when EMS arrived. R. 303. EMS administered 6 mg adenosine, and her heart rate dropped to normal levels. *Id.* Angela reported decreased water intake. R. 304. Physical examination findings were unremarkable aside from slightly dry mucus membranes in the mouth and throat. R. 305.  Angela was discharged in stable condition. R. 307.

On September 24, 2020, Angela returned to the care of Denise Jones at Roanoke Cardiology for a follow-up appointment. R. 296–99. Angela reported she resumed taking

Cardizem daily and had no SVT episodes since February 2020, R. 297. She stated she was concerned about intermittent ankle swelling that usually resolved overnight and worsened during the summer heat. *Id.* Physical examination findings were unremarkable. R. 298. Ms. Jones advised Angela to remain compliant with medications. R. 299.

On October 2, 2020, emergency responders transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 291–95. EMS administered 6 mg adenosine, after which Angela's heart rate stabilized. R. 292. Angela reported remaining compliant with her medication. R. 293. Angela was discharged in stable condition. R. 294–95.

On April 20, 2021, emergency responders transported Angela to the emergency department at Carilion Clinic. R. 690–94. EMS administered 6 mg adenosine, which was unsuccessful in conversion, so they administered an additional 12 mg of adenosine, after which Angela's heart rate stabilized. R. 690. Angela presented with no symptoms and denied chest pain, palpitations, shortness of breath, abdominal pain, nausea, vomiting, and diaphoresis. *Id.* Physical examination findings were unremarkable. R. 691–92. Angela was discharged in stable condition. R. 693.

On July 7, 2021, Angela returned to the care of Ms. Jones. R. 766–69. Angela reported ankle swelling because of the summer heat. R. 766. She reported the swelling resolves overnight and reoccurs if she stays outdoors. *Id.* Physical examination findings were unremarkable aside from trace ankle edema. R. 767. Ms. Jones discussed Angela's potential for an SVT ablation, but Angela declined the procedure. R. 768.

On July 11, 2021, EMS transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 761–65. Emergency responders administered 6 mg adenosine to Angela prior to her arrival at the hospital. R. 761. Angela denied any pain or symptoms and was able to rest comfortably in triage. R. 762. Angela reported compliance with her

11

medication. R. 762. Physical examination findings were unremarkable. R. 763–64. Angela was discharged in stable condition and instructed to follow up with her primary care provider. R. 765.

On October 9, 2021, EMS transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 789–95. Emergency responders administered 6 mg adenosine prior to her arrival at the hospital. R. 791. After arrival at the hospital, Angela denied any symptoms. *Id.* Physical examination findings were unremarkable. R. 792–93. Angela was discharged in stable condition. R. 794.

On November 25, 2021, EMS transported Angela to the emergency department at Lewis Gale Hospital after an SVT episode. R. 927–32. Emergency responders administered 6 mg adenosine, which resolved the episode. R. 927. After Angela arrived at the hospital, she reported her symptoms resolved and denied having chest pain, shortness of breath, dizziness, diaphoresis, or nausea. *Id.* Angela was discharged in stable condition. R. 932.

On December 4, 2021, EMS transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 856–65. Emergency responders administered 6 mg adenosine, which resolved the episode. R. 858. After Angela was admitted to the hospital, providers administered magnesium sulfate intravenously; however, Angela complained of side effects and refused to continue with magnesium treatment. R. 859. Physical examination findings were unremarkable. R. 860–62. Angela was discharged in stable condition. R. 865.

On January 24, 2022, Angela returned to the care of Ms. Jones at Roanoke Cardiology. R. 853–56. Angela reported her recent SVT episodes. R. 853. Physical examination findings were unremarkable aside from trace ankle edema. R. 855. Ms. Jones discussed Angela's potential for an SVT ablation, which procedure Angela declined. R. 856. Ms. Jones advised Angela to continue her current medication. *Id.*

On March 6, 2024, EMS transported Angela to the emergency department at Roanoke Memorial Hospital after another SVT episode. R. 847–51. Angela's symptoms resolved by the time EMS arrived at her home. R. 849. Angela denied any symptoms at the hospital. *Id.* Physical examination findings were unremarkable. R. 850. Angela was discharged in stable condition. R. 850–51.

On May 12, 2022, EMS transported Angela to the emergency department at Roanoke Memorial Hospital after an SVT episode. R. 933–38. Emergency providers administered 12 mg adenosine, which resolved her symptoms. R. 933. Angela had no complaints at the hospital. *Id.* Physical examination findings were unremarkable. R. 935. Angela was discharged in stable condition. R. 936.

On July 18, 2022, Angela returned to the care of Ms. Howard for an annual physical. R. 969–77. Physical examination findings were unremarkable. R. 792–73. Ms. Howard discussed diet and exercise with Angela. R. 975.

### C. Medical Opinions

In a "Disability Determination Explanation" dated June 22, 2021, Jack Hutcheson, Jr., M.D., a medical consultant with Disability Determination Service, opined that Angela had the following severe impairments: cardiac dysrhythmias, obesity, hyperlipidemia, and essential hypertension. R. 114. He opined the limitations imposed by those impairments would not prevent Angela from frequently lifting and/or carrying 10 pounds, occasionally lifting and/or carrying 20 pounds, sitting about 6 hours in an 8-hour workday, or standing and/or walking about 6 hours in an 8-hour workday. R. 116. He indicated Angela has no postural, manipulative, visual, communicative, or environmental limitations. *Id.*

In that same June 22, 2021 form, Stephen Saxby, Ph.D., a psychological consultant with Disability Determination Service, opined that Angela's depressive, bipolar, and related disorders are not severe impairments. R. 114. He indicated there was insufficient evidence to assess the impact of any mental impairments on Angela's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage oneself. *Id.*

In a "Disability Determination Explanation" dated November 22, 2021, Nicholas Tulou, M.D., a medical consultant with Disability Determination Service, found that Angela had the following severe impairments: cardiac dysrhythmias, obesity, hyperlipidemia, and essential hypertension. R. 123. He opined the limitations imposed by those impairments would not prevent Angela from frequently lifting and/or carrying 10 pounds, occasionally lifting and/or carrying 20 pounds, sitting about 6 hours in an 8-hour workday, or standing and/or walking about 6 hours in an 8-hour workday. R. 125. He indicated Angela has no manipulative, visual, or communicative limitations, but that Angela is limited to occasional stooping, crouching, and climbing ramps and stairs; is unable to climb ladders, ropes, or scaffolds; is capable of frequent balancing, kneeling, and crawling; must avoid concentrated exposure to extreme heat, extreme cold, and humidity; and she must avoid even moderate exposure to hazards such as machinery or heights. R. 126.

In that same November 22, 2021 form, Daniel Walter, Psy.D., a psychological consultant with Disability Determination Service, found that Angela's depressive, bipolar, and related disorders, as well as her anxiety and obsessive-compulsive disorders, are not severe impairments. R. 123. He indicated those impairments cause only mild limitations in Angela's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. *Id.*

## ANALYSIS

Angela alleges the ALJ erred in his assessment of Angela's (1) obesity under SSR 02-1p, (2) impairments and RFC findings, and (3) subjective allegations. *See* ECF No. 13 at 16–29.

### I.    The ALJ's Assessment of Angela's Obesity Under SSR 02-1p

Angela first argues the ALJ erred in his assessment of Angela's obesity under SSR 02–1p. *See* ECF No. 16–20.

As the Commissioner rightly points out, SSR 19-2p- rescinded and replaced SSR 02-1p on May 20, 2019. *See* ECF No. 16 at 9. Under SSR 19-2p, the ALJ must consider a claimant's obesity in steps two through five of the five-step inquiry. *See* SSR 19-2p, 2019 SSR LEXIS 2, 2019 WL 2374244, at *2 (May 20, 2019). However, the ALJ is not required to include any detailed analysis regarding a claimant's obesity. *See Lakeysia G. v. Kijakazi*, No. 4:22-CV-5, 2023 U.S. Dist. LEXIS 51550, at *13 (W.D. Va. Mar. 9, 2023). Additionally, "to challenge an ALJ's obesity analysis, a claimant must advance additional, obesity-related functional limitations not accounted for by the ALJ in his RFC determination." *Tonya D. v. Kijakazi*, No. 7:20-CV-777, 2022 U.S. Dist. LEXIS 45738, at *8 (W.D. Va. Feb. 7, 2022).

In this case, the ALJ determined obesity to be a severe impairment at step two. R. 21. At step three, the ALJ cited SSR 19-2p for the relevant analysis of obesity and concluded "the medical evidence does not support a finding that the claimant's obesity has reached a level that would cause the other impairments to meet or medically equal a listed impairment." R. 24. In considering the effect of Angela's obesity on her RFC, the ALJ explained her obesity, in coordination with Angela's other impairments, limited her to "light exertion with postural and environmental limitations," but "further limitations are not warranted as [Angela] had normal gait, station, sensation, reflexes and strength." R. 28.  At step four, the ALJ concluded Angela

had no past relevant work, so no analysis of Angela's obesity was needed. R. 30. At the fifth

step, the ALJ considered whether there were jobs in the national economy that Angela could

perform considering her RFC, which, as indicated above, incorporated limitations related to

Angela's obesity. R. 31.

Therefore, the ALJ's assessment of Angela's obesity complied with the requirements of

SSR 19-2p and is supported by substantial evidence, and the presiding District Judge should not

remand the Commissioner's decision on that basis.

## II.    The ALJ's Assessment of Angela's Physical Impairments and RFC Findings

Next, Angela claims the ALJ erred in his assessment of her physical impairments. *See* ECF

No. 13 at 20–26. Specifically, Angela argues the ALJ failed to conduct a function-by-function

analysis in accordance with SSR 96-8p. *See id.* at 20–21.

The ALJ is required to develop an adequate RFC that accounts for the work activities the

claimant can perform given the physical or mental impairments affecting her ability to work.

Importantly, the ALJ must explain the conclusions reached and explain any record evidence

which contradicts the RFC determination. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2,

1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting

his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary

work setting on a regular and continuing basis, describe the maximum amount of each work-

related activity the individual can perform, and explain how any material inconsistencies or

ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence

in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2015) (quoting *Dyer v. Barnhart*,

395 F.3d 1206, 1211 (11th Cir. 2005).

In *Mascio v. Colvin*, the Fourth Circuit rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ engaged in a sufficient narrative discussion of the evidence as required by SSR 96-8p and that discussion contains sufficient information and analysis of Angela's ability to perform sustained work activities to allow this Court to undertake meaningful review. *See* R. 29–37. The ALJ explains that treatment records, as well as Angela's own description of her activities, do not suggest more significant physical impairments than are accommodated by the RFC. R. 27–30. Regarding Angela's SVT episodes, for example, the ALJ concluded that she should be limited to light exertion with postural and environmental limitations; furthermore, because of the infrequent nature of the SVT episodes, the ALJ accounts for Angela's SVT in the RFC by providing that she is expected to be off-task 10% of the workday and absent an average of 1.5 days per month. R. 28. Overall, the ALJ provided a sufficient narrative discussion and explained how he reached his assessment of Angela's physical impairments and RFC findings.

Therefore, the Court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Angela's medical records, the medical opinions, Angela's testimony, and the ALJ's conclusions. As a result, the ALJ did not err in his assessment of Angela's physical impairments and RFC findings, and the presiding District Judge should not remand the Commissioner's decision on that basis.

### III.    The ALJ's Assessment of Angela's Subjective Allegations

Lastly, Angela claims that the ALJ erred in his assessment of Angela's subjective allegations. *See* ECF No. 13 at 26–29. Specifically, Angela argues the ALJ improperly discounted Angela's subjective allegations without providing any reasoning. *See id.* at 27.

Under the regulations implementing the Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms. *Id.* at 3, § 404.1529(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* § 404.1529(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of the symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

"The ALJ may choose to reject a claimant's testimony regarding [her] pain or physical condition, but he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence." *Mabus v. Colvin*, 2015 U.S. Dist. LEXIS 38179, *39-40 (S.C. Dist. Mar. 26, 2015) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n. 2 (4th Cir. 1984)). A claimant "is entitled to rely exclusively on subjective evidence to prove that her symptoms were so continuous and/or so severe that [they] prevent[ed] [her] from working a full eight hour day,' and an ALJ 'applie[s] an incorrect legal standard' when discrediting [claimant's] complaints based on the lack of objective evidence corroborating them." *Hines v. Barnhart*, 453 F.3d 559, 563, 565 (4th Cir. 2006); *see also Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017)

(finding an ALJ "improperly increased the burden of proof by effectively requiring claimant's subjective descriptions of her symptoms to be supported by objective medical evidence"). An ALJ's assessment of the credibility of a claimant's subjective complaints is afforded a high level of deference on review, as the Fourth Circuit has proclaimed such an assessment is "virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010).

In this case, as noted above, the ALJ's opinion includes a thorough and robust discussion of both Angela's medical history and her testimony. R. 21–23; 24–28. The ALJ found that Angela's medically determinable impairments could reasonably be expected to cause her alleged symptoms. R. 25. However, he concluded that Angela's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not consistent with the medical evidence and other evidence in the record. *Id.* The ALJ explains his reasoning for his conclusion because the treatment of Angela's impairments "[has] been essentially routine, conservative, and/or successful." R. 27. He further explains that, regarding Angela's SVT, she "often denied new onset of symptoms," and her cardiologist "regularly recommended only continuation of medication." *Id.* Overall, the ALJ adequately explains his reasoning for his conclusion that Angela's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not consistent with the medical evidence.

In further support of her position that the ALJ erred in considering her subjective testimony, Angela cites to *Brown v. Comm'r Soc. Sec.*, 873 F.3d 251, 269–70 (4th Cir. 2017), *Arakas v. Comm'r Soc. Sec.*, 983 F.3d 83, 100 (4th Cir. 2020), and other similar cases in the Fourth Circuit. In *Arakas*, the Court found that the ALJ's assessment regarding the claimant's daily activities failed to account for "significant other testimony" from the claimant that was at odds with the ALJ's conclusion. *Arakas*, 983 F.3d at 100. In doing so, the Court determined that the claimant's

19

subjective allegations and activities of daily living were consistent. *Id*. This error is not present in this case. The ALJ explicitly considered Angela's daily activities (such as cooking, cleaning, and walking her dog), as well as her allegations about her symptoms, and concluded that her reported daily activities suggest less functional loss than generally alleged. R. 24, 27. I find that there is substantial evidence to support the ALJ's conclusions in this regard.

In *Brown*, the Fourth Circuit found that the ALJ committed numerous errors, including failing to acknowledge the extent of the activities of daily living, stating:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping . . . The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared his meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities by Brown—showed that he could persist through an eight-hour workday.

873 F.3d at 263.

Here, unlike in *Brown*, the ALJ's assessment shows he understood Angela's limits in completing her activities of daily living, and he addresses Angela's claims of fatigue following an SVT episode. *See* R. 25. The ALJ, with citations to the record, specifically acknowledged that Angela is limited in certain regards, and he explained how the restrictions imposed by the RFC accommodate those limitations. *See* R. 28–30. Thus, I find that the ALJ did not err in his assessment of Angela's subjective allegations, and the presiding District Judge should not remand on this basis.

## CONCLUSION

For the above reasons, I recommend the presiding District Judge **DENY** Angela's Motion for Summary Judgment, ECF No. 12, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

Entered:  August 7, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge